# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| CCR/AG SHOWCASE PHASE I OWNER, LLC, a Delaware Limited Liability Corporation,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>UNITED ARTISTS THEATRE CIRCUIT, INC. et al.,<br><br>　　　　　　Defendants. | 2:08-CV-00984-RCJ-GWF<br><br>**ORDER** |

This case arises out of a cinema's alleged failure to pay rent to the owner of commercial property at a mall on the Las Vegas Strip, as well as its failure to adhere to a prior agreement to change the way customers are charged for parking. The cinema has counterclaimed for constructive eviction and breach of the lease with respect to customer parking issues. Pending before the Court is Defendant's Motion in Limine (ECF No. 173) requesting a jury view of the property site. For the reasons given herein, the Court denies the motion.

**I.      FACTS AND PROCEDURAL HISTORY**

The Showcase Mall is a retail and entertainment complex located next to the MGM Grand Hotel & Casino in Las Vegas, Nevada. (First Am. Compl. ¶ 8, May 13, 2009, ECF No. 30). In 1995, Defendant United Artists Theatre Circuit, Inc. ("UA") entered into a lease with Showcase Mall Joint Venture ("SMJV"), the then-owner of the Showcase Mall Phase I ("Phase

I"), to lease approximately 42,000 square feet on the ground level of the Showcase Mall Phase I parking garage (the "Garage") for the use of its employees, invitees, and customers (the "Lease"). (*Id.* ¶¶ 11–13). The Lease was for twenty years, with options to extend for to five-year periods. (*Id.* ¶ 14). Under the Lease, UA agreed to pay a "Minimum Rent" and a "Parking Charge" per square foot, both of which were to be paid in monthly installments, and the Minimum Rent was to increase by predetermined amounts in certain years. (*See id.* ¶ 15). The Lease also provided that SMJV would charge hourly parking in the Garage, but that UA could validate up to two hours of free parking for its employees, invitees, and customers (the "Parking Validation System"). (*Id.* ¶ 16). The Lease also provided for SMJV's advertisement of the Showcase Mall via construction of a pylon sign (the "Sign") at the entrance of the Garage leading to the theatre, and UA had the right to construct, install, and maintain a readerboard (the "Readerboard") on the Sign. (*Id.* ¶¶ 17–18).

In or about 1998, SMJV and UA agreed to stop using the Parking Validation System in favor of a flat $2.00 parking fee, (*id.* ¶¶ 23–24), and that customers would be given promotional coupons from various tenants of the Showcase Mall at the entrance of the Garage, with UA (and presumably other tenants, as well) responsible for the costs of redeeming those coupons (*id.* ¶ 25). UA never objected to the previous Parking Validation System or alleged it was a violation of the Lease. (*Id.* ¶¶ 26–29).

In 2004, Plaintiff CCR/AG Showcase Phase I Owner, L.L.C. ("Phase I Owner") began negotiating purchase of Phase I from SMJV and executed an Estoppel Certificate with UA indicating that neither landlord nor tenant were in default or other violation of the Lease, and Phase I Owner purchased Phase I on February 11, 2005 based upon this representation, succeeding to SMJV's interest in the Lease. (*Id.* ¶¶ 30–32). Between 2006 and 2008, Phase I Owner and UA discussed a promotion under which customers would receive coupons a the entrance to the Garage that they could redeem at UA's concession stands. (*Id.* ¶ 34).

     In 2006, Phase III Owner, an entity "affiliated with" Phase I Owner, notified UA that it intended to construct a building (the "New Building") between Las Vegas Blvd. and the theatre. (*Id.* ¶ 37). The theatre lacked stadium seating, and in order to make it more competitive, UA discussed with Phase III Owner the possibility of leasing space in the New Building to provide stadium seating, but ultimately did not do so. (*Id.* ¶¶ 38–40). Phase III Owner notified UA that construction of the New Building might affect business at the theatre, and Phase I Owner offered to replace the Sign and Readerboard with new signage in a more visible location and to install new heating and air conditioning and a new grease trap and trash compactor. (*Id.* ¶¶ 41–43). In or about April 2007, the parties verbally agreed to the modifications, and Phase I Owner sent UA a draft lease modification agreement. (*Id.* ¶ 45). At this time, Phase I Owner and Phase III Owner entered into a Reciprocal Easement. (*Id.* ¶ 47). UA approved the upgrades in the draft lease modification agreement, including designs for the new signage on July 19, 2007, and Phase I Owner destroyed the old signage a week later in reliance. (*Id.* ¶¶ 48–51). Phase I Owner has also, with UA's acquiescence, replaced the heating and air conditioning system and installed a new grease trap and trash compactor, installed new signage, and relocated existing signage. (*Id.* ¶ 53).

     In March 2008, UA represented that it was prepared to execute the draft lease modification agreement, but UA then announced it would not do so and for the first time claimed that it had been constructively evicted and threatened to terminate the Lease. (*Id.* ¶¶ 56–58). Phase I Owner alleges that UA is simply attempting to cut its losses and abandon its obligations under the Lease because of the theatre's poor performance. (*See id.* ¶¶ 60–63). UA now claims that the New Building isolates the theatre from potential customers and has caused its losses, that Phase I owner has breached the Lease by adjusting the signage and failing to continue the Parking Validation System, and that it has been constructively evicted. (*Id.* ¶¶ 64–67). UA has demanded a return to the previous Parking Validation System under the Lease and that Phase I

1  Owner reimburse certain past parking charges. (*Id.* ¶¶ 68–69).

2  In July 2008, Phase I Owner sued UA in this Court. The First Amended Complaint
3  ("FAC") filed in May 2009 lists five causes of action: (1) breach of contract; (2) breach of the
4  implied covenant of good faith and fair dealing; (3) promissory estoppel (theatre upgrades); (4)
5  promissory estoppel (parking charges); and (5) declaratory relief. Defendant filed a
6  Counterclaim listing two causes of action: (1) breach of contract; and (2) constructive eviction.
7  The Court denied Plaintiff leave to file an untimely motion for defensive summary judgment and
8  partial offensive summary judgment and struck the proposed motion. (*See* Min. Order, May 20,
9  2011, ECF No. 142). Plaintiff has filed four motions in limine, and Defendant has filed one.
10 The present order addresses Defendant's motion only.

11 **II.    LEGAL STANDARDS**

12 A motion in limine is a procedural device to obtain an early and preliminary ruling on the
13 admissibility of evidence. Black's Law Dictionary defines it as "[a] pretrial request that certain
14 inadmissible evidence not be referred to or offered at trial. Typically, a party makes this motion
15 when it believes that mere mention of the evidence during trial would be highly prejudicial and
16 could not be remedied by an instruction to disregard." *Black's Law Dictionary* 1109 (9th ed.
17 2009). Although the Federal Rules of Evidence do not explicitly authorize a motion in limine,
18 the Supreme Court has held that trial judges are authorized to rule on motions in limine pursuant
19 to their authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing Fed.
20 R. Evid. 103(c) (providing that trial should be conducted so as to "prevent inadmissible evidence
21 from being suggested to the jury by any means")).

22 A motion in limine is a request for the court's guidance concerning an evidentiary
23 question. *See Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999). Judges have broad
24 discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d
25 663, 664 (7th Cir. 2002). However, a motion in limine should not be used to resolve factual

disputes or weigh evidence. *See C&E Servs., Inc., v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008). To exclude evidence on a motion in limine "the evidence must be inadmissible on all potential grounds." *E.g.*, *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). This is because although rulings on motions in limine may save "time, costs, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1219 (D. Kan. 2007).

In limine rulings are provisional. Such "rulings are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

**III. ANALYSIS**

Defendant asks the Court to permit the jury to view the subject real property in this case. Defendant argues that viewing the configuration of the property will aid the jury in determining whether there has been a constructive eviction or a material breach of the lease. Defendant argues that although it intends to introduce photographic evidence of the visibility of the signage and accessibility of the property, a visit to the site will better aid the jury in understanding the changes in visibility between the former pylon sign and the sign that replaced it, as well as the effect of the addition of the new Phase III building on the visibility of and access to Defendant's building in Phase I.

Although most states have statutes expressly governing jury views, the Federal Rules of Evidence do not address jury views expressly, though rules of relevancy, prejudice, and efficiency apply. 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5176 (1978).  Logistical problems in coordinating a jury view weigh against a view under a Rule 403 analysis. *Id.* (2011 Supp.).  The Ninth Circuit appears to permit such visits. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1266–67 (9th Cir. 2001) ("Neither is there anything wrong with official excursions by a judge or jury to view evidence that simply cannot, because of physical limitations, be brought into a courtroom.").  Here, the Court is not convinced the proposed photographic evidence will be insufficient for Defendant to present its case, and the logistics of a jury view on the Las Vegas Strip outweigh the additional value of the view to the jury.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion in Limine (ECF No. 173) is DENIED.

IT IS SO ORDERED.

Dated this 12th day of January, 2012.

_____
ROBERT C. JONES
United States District Judge